2022 IL App (1st) 200949-U

No. 1-20-0949

Order filed March 25, 2022

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 C3 30295 |
| | ) | |
| FILIBERTO CALDERON, | ) | Honorable |
| | ) | Steven J. Goebel, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE PIERCE delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's 17-year sentence for attempted murder over his contentions that it was excessive and an abuse of discretion.

¶ 2    Following a bench trial, defendant Filiberto Calderon was convicted of attempted murder (720 ILCS 5/8-4(a), 9-1(a) (West 2016)) and sentenced to 17 years' imprisonment. On appeal, he argues his sentence was excessive and an abuse of discretion. For the following reasons, we affirm.

¶ 3    Because defendant does not challenge the sufficiency of the evidence, we recite only those facts necessary to our disposition. Defendant went to trial on three counts: attempted murder, aggravated domestic battery, and aggravated battery for stabbing his wife, Samantha Segura. The evidence at trial established that defendant and Segura had been married for 10 years but separated in August 2017. They had a 10-year-old daughter. Segura, defendant, and their daughter had lived with Segura's parents in Hoffman Estates prior to their separation, but defendant had moved out.

¶ 4    In the months leading up to their separation, defendant made threats to Segura, who assumed they were "empty" threats because he made them so frequently. He threatened to take their daughter away. Defendant repeatedly threatened to kill Segura if she tried to leave him or if he found her with another person. A week prior to moving out, defendant told Segura if he found her with another person, he would cut off their genitals, cook them in soup and eat it, and then kill himself. He also slapped her and threatened to kill her a few days prior to September 3, 2017.

¶ 5    On the night of September 2, 2017, defendant visited his friend Derrick Ruffin. Defendant appeared intoxicated and told Ruffin that he was going to hurt Segura because he believed she was cheating on him. Defendant showed Ruffin a "machete" knife he had inside his coat and left. Ruffin later called the police to report that defendant was "going to do something to his wife."

¶ 6    That same night, defendant texted and called Segura, saying that he needed to pick up some winter coats that he had left behind at the residence in Hoffman Estates. Segura put defendant's coats in a bag and left them outside for him to retrieve. Defendant repeatedly texted and called her to speak with him outside, but she refused and blocked his phone number and went to bed. Defendant rapped on her bedroom window at around 9:45 p.m. Shortly after midnight on September 3, 2017, Segura was awoken by police at her door, who were conducting a well-being

check based on information that defendant presented a threat to her. Segura told the officers she had not seen defendant and returned to bed. Other officers spoke with defendant around 1 a.m., and defendant informed them that he had no intention of harming himself.

¶ 7    Around 5 a.m., Segura left her house to go to work. When she walked outside, she noticed defendant hiding behind her car. Defendant approached her and was holding a knife behind his back. Segura threw her coffee at him, but defendant immediately stabbed her in the stomach. She yelled for help and told him to think about their daughter. Segura fell on her back, and defendant got on top of her with the knife and attempted to stab her again. Eventually, Segura got hold of the knife and threw it onto the roof of her house. She then ran to a neighbor's home, where she called 911 and was transported to the hospital shortly thereafter. Police recovered the knife from the roof of Segura's residence and determined it was approximately 10 inches long and 3 and half inches wide.

¶ 8    The trauma surgeon who treated Segura testified she displayed signs of hemorrhagic shock and was bleeding from a large wound in her stomach measuring four centimeters wide and four to five centimeters deep. Segura had surgery, which revealed she had bled significantly into her rectus muscle due an actively bleeding artery. The artery required a suture to stop the bleeding. Segura's abdominal wall required repair and staples, and she received a blood transfusion. She had a drain left in the wound to allow infection to drain out. The knife penetrated her abdomen but did not hit any vital organs. However, the surgeon testified the wound was millimeters from "all major central organs that the body has" and was potentially life-threatening. Segura was discharged from the hospital on September 6, 2017, and had the staples removed on September 18, 2017. She had a large scar on her stomach, which reminded her daily of the incident. Segura underwent physical

therapy and was unable to work for eight weeks. After eight weeks, she was permitted to return to work full time; however, she still got cramps in her stomach and had pain when she lifted heavy objects.

¶ 9     The trial court found defendant guilty of all three charges.

¶ 10     Defendant's presentence investigation report (PSI) showed he was from Mexico, grew up poor, and was raised by both of his parents. He reported he had been sexually abused by his uncle as a child. Defendant completed one year of college and dropped out to move to the U.S. He had no criminal background or gang involvement and had been employed as a kitchen manager until he was arrested in the instant case.  Defendant was seeing a mental health professional while incarcerated and was attending weekly clinical therapeutic groups. He reported an issue with alcohol and claimed to be a " 'functioning alcoholic.' "

¶ 11     At sentencing, the State presented victim impact statements from Segura and her father in aggravation. The letter from Segura recounted the attack and how she fought defendant off her. She detailed defendant's years of abusive behavior. Segura informed the court that, although defendant was in jail, he violated an order of protection she had against him multiple times, and she and her family lived in constant fear of him. The letter from Segura's father similarly detailed how the Segura family feared defendant and requested the maximum sentence.

¶ 12     In mitigation, defense counsel argued several statutory factors weighed in favor of imposing the minimum sentence. Specifically, defendant acted under strong provocation because he believed Segura was unfaithful, and his belief was "compounded by the fact that he had alcohol in his system at the time." Counsel further argued defendant was 41 years old and had substantial work history and no criminal background. Counsel claimed defendant's conduct was a result of

circumstances unlikely to recur, and defendant's attitude indicated he was unlikely to commit another crime. Counsel referenced the PSI, noting defendant had no gang involvement, was assaulted at a young age, graduated high school, and had been employed full time. Counsel emphasized defendant's "very good" relationship with Segura and their daughter and pointed out that defendant "did not pursue [Segura] once she was injured and down."

¶ 13    Arturo Delgado, defendant's cousin, testified that defendant had a good relationship with his daughter, based on his own observations. Delgado worked with defendant and said he treated people with respect. Further, Delgado testified that defendant was a good person, responsible, and took care of his family.

¶ 14    The defense also presented in mitigation a video statement from Ruffin, who stated defendant gave him rides to the doctor and to pick up medication. Defendant also brought him food. Ruffin described defendant as a provider for his family and noted defendant had a "very close" relationship with his daughter. Ruffin additionally stated that defendant was not violent in his experience.

¶ 15    In allocution, defendant stated he received treatment while in jail and participated in a church group and earned certificates "based on Bible teaching." The certificates were submitted to the court. He additionally attended a clinical therapeutical group while incarcerated. Defendant stated he took courses while in jail because he needed emotional help and "was in a bad place." He had a "beautiful" relationship with his daughter and took her out often. Defendant had been a kitchen manager at a restaurant, where he had worked for about five years. Defendant apologized to Segura and her family, noting he had learned "how to live [his] life" while incarcerated. He additionally stated he came from Mexico, where there was violence and poverty. He was depressed

when he met Segura and "wanted to die consuming alcohol." Defendant claimed Segura encouraged him to not seek help for his alcoholism.

¶ 16    The court merged the aggravated domestic battery and aggravated battery counts into the attempted murder count and sentenced defendant to 17 years' imprisonment. In imposing sentence, the court stated it considered the evidence and arguments presented in aggravation and mitigation, the PSI, the victim impact statements, Ruffin's videotaped testimony, defendant's statement in allocution, and the statutory factors in aggravation and mitigation. The court referenced defendant's "sadness" from his childhood, his reported sexual abuse, his educational and work histories, his good relationship with his daughter, and the fact that defendant provided for his family. It took seriously defendant's threat to take his daughter from Segura and noted defendant had issues with alcohol, depression, and anxiety. Against those considerations, the court weighed that defendant planned the offense and convinced the police that he was not a threat that night. The court found defendant's conduct was "diabolical" and "sinister in its intent." Further, it believed defendant, if released, would attempt to kill Segura again, in part "based on looking at his demeanor in the court today, even though he apologized."

¶ 17    Defendant filed a motion to reconsider sentence, which the trial court denied. Defendant timely appealed.

¶ 18    On appeal, defendant contends his 17-year sentence was excessive given it was his first criminal offense and an abuse of discretion based on the circumstances of the crime, the extent of Segura's injury, and other mitigating evidence. He asks that this court reduce his sentence to one closer to the six-year minimum.

¶ 19    The Illinois Constitution provides that "[a]ll penalties shall be determined both according

to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. In determining an appropriate sentence, the trial court considers such factors as "a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment." *People v. Hernandez*, 319 Ill. App. 3d 520, 529 (2001).

¶ 20    We accord great deference to a trial court's sentence and will not reverse it absent an abuse of discretion. *People v. Butler*, 2013 IL App (1st) 120923, ¶ 30 (citing *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000)). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *People v. Jackson,* 375 Ill. App. 3d 796, 800 (2007). Because the trial court, having observed the proceedings, is in the best position to weigh the relevant sentencing factors (*People v. Arze*, 2016 IL App (1st) 131959, ¶ 121), we do not substitute our judgment for that of the trial court simply because we would have balanced the appropriate sentencing factors differently (*People v. Alexander*, 239 Ill. 2d 205, 213 (2010)).

¶ 21    Here, defendant was convicted of attempted murder, a Class X felony subject to a sentencing range of 6 to 30 years' imprisonment. 720 ILCS 5/8-4(c)(1) (West 2016) ("the sentence for attempt to commit first degree murder is the sentence for a Class X felony"); 730 ILCS 5/5-4.5-25(1) (West 2016) (the sentence for Class X felonies is "not less than 6 years and not more than 30 years"). Defendant was sentenced to a 17-year sentence, which is within the statutory range and therefore presumed proper. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 12.

¶ 22    Nevertheless, defendant argues the sentence was excessive as the instant conviction was his first criminal offense and he had no prior criminal history, including arrests, which weighed in

favor of a lesser sentence. See 730 ILCS 5/5-5-3.1(a)(7) (West 2016) (the defendant having "no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present crime" shall be accorded weight in mitigation). He additionally asserts other mitigating factors, such as his work history and dedication to providing for his family, also weighed in favor of a lesser sentence.

¶ 23    Defendant essentially asks this court to reweigh the evidence presented in aggravation and mitigation and substitute our judgment for that of the trial court. We decline to usurp a function reserved for the trial court. See *Stacey*, 193 Ill. 2d at 209. Absent some indication to the contrary, other than the sentence itself, we presume the trial court properly considered all relevant mitigating factors presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. The record here affirmatively demonstrates the court considered the mitigating evidence defendant raises on appeal. The court referenced defendant's PSI, the evidence in aggravation and mitigation, the statutory factors in aggravation and mitigation, the victim impact statements, and defendant's statement in allocution. The court explicitly considered defendant's childhood, lack of criminal background, and recognized his work history and history of providing for his family. The court stated it was weighing those mitigating factors against the aggravating factors, including that it believed defendant planned the offense and was likely to attempt to harm Segura again upon release. Defendant merely disagrees with the weight the trial court accorded to the relevant mitigating factors. However, the existence of mitigating factors does not require the trial court to impose the minimum sentence. *People v. Harmon,* 2015 IL App (1st) 122345, ¶123.

¶ 24    Defendant further claims that the circumstances underlying the offense and the extent of Segura's injury warrant a lesser sentence. As support for this contention defendant argues Segura's

injury was not life-threatening and did not result in serious permanent disability or disfigurement; she was discharged after three days in the hospital and returned to work after eight weeks; he believed Segura was cheating on him and had been drinking on the night in question; and there were no known calls to the police or orders of protection filed during the 10-year marriage, and he made only "empty threats over the years."

¶ 25    Again, we disagree with defendant's assessment. The most important sentencing factor is the seriousness of the offense. *Harmon*, 2015 IL App (1st) 122345, ¶ 123. Contrary to defendant's claims, the underlying circumstances of the offense and Segura's injury amply support the 17-year sentence. Defendant repeatedly threatened Segura in the months leading up to the crime. He told his friend on the night of the offense that he planned to hurt Segura because he believed she was cheating on him and displayed a large knife that he was carrying in his coat. Later that night, he attempted to have Segura leave her house via repeated phone calls and texts. She refused. Then, early the next morning, defendant hid by Segura's car and waited for her to leave the house on her way to work. When she approached, he stabbed her in the stomach, and continued to attempt to stab her as she lay on the ground. The knife he used was approximately 10 inches long and 3 and a half inches wide.

¶ 26    While defendant claims Segura's injury was not serious and did not result in permanent disfigurement, the evidence flatly contradicts this argument. Segura's injury required immediate surgery, a sutured artery, stomach staples, and a drain. The trauma surgeon testified the wound was mere millimeters from major organs and the injury was potentially life-threatening. The injury resulted in a scar, which Segura stated continued to be painful and reminded her of the incident. Although she was able to return to work after eight weeks, she still suffered pain when performing

her duties. In sum, the trial evidence demonstrates the 17-year sentence reflects the serious nature of the offense, where defendant laid in wait for Segura and stabbed her with a 10-inch knife, narrowly missing her vital organs.

¶ 27 For the foregoing reasons, we find defendant has not overcome the presumption that his sentence is proper. The record shows the trial court did not abuse its discretion at sentencing where it considered the appropriate sentencing factors in determining his sentence and the 17-year sentence was not manifestly disproportionate to the nature of the offense. Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 28 Affirmed.